No. 21-55009

IN THE

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

───────────────────────────────────

EDMOND CARMONA, ABRAHAM MENDOZA, ROGER NOGUEIRA,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellees*,

vs.

DOMINO'S PIZZA LLC,
*Defendant-Appellant*,

───────────────────────────────────

On Appeal from the U.S. District Court
for the Central District of California
No. 8:20-cv-01905-JVS-JDE (Hon. James V. Selna)

───────────────────────────────────

**BRIEF OF THE AMERICAN ASSOCIATION FOR JUSTICE AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

───────────────────────────────────

| | |
|---|---|
| TAD THOMAS | GERSON H. SMOGER |
| *President* | *Counsel of Record* |
| JEFFREY R. WHITE | SMOGER & ASSOCIATES |
| *Senior Associate General Counsel* | 4228 Hallmark Drive |
| AMERICAN ASSOCIATION FOR JUSTICE | Dallas, TX 75229 |
| 777 Sixth Street NW, Suite 200 | (972) 243-5297 |
| Washington, DC 20001 | gerson@texasinjurylaw.com |
| (202) 617-5620 | |
| tad.thomas@justice.org | |
| jeffrey.white@justice.org | |

*Counsel for Amicus Curiae*

February 1, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae the American Association for Justice certify that it is a non-profit organization. It has no parent corporation or publicly owned corporation that owns 10% or more of its stock.

Respectfully submitted this 1st day of February 2023.

/s/ Gerson H. Smoger

GERSON H. SMOGER
*Counsel for Amicus Curiae*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ........................................................................................ ii

TABLE OF AUTHORITIES ................................................................................. iii

IDENTITY AND INTEREST OF AMICUS CURIAE ........................................ 1

SUMMARY OF ARGUMENT ............................................................................. 1

ARGUMENT ......................................................................................................... 3

    I.    THE EXEMPTION LANGUAGE OF THE FEDERAL ARBITRATION ACT WAS MEANT TO EXCLUDE ALL EMPLOYEE CONTRACTS, INCLUDING THE CONTRACTS OF DOMINO'S "BIG-RIG" PLAINTIFFS HEREIN, FROM THE FAA ................................................ 3

        A.    Background of the FAA. .................................................................. 3

        B.    Congressional Hearings Addressed Labor Opposition to Arbitration of Employment Contracts by Using the ABA's Revised Language, Adding an Exemption to Section 1 ..................................................... 4

    II.    IN *CIRCUIT CITY* AND *NEW PRIME*, THE SUPREME COURT CONSTRUED THE EXEMPTION TO APPLY TO ALL TRANSPORTATION WORKERS ACTING WITHIN THE STREAM OF COMMERCE ............................................................................................ 6

    III.    *SAXON* DOES NOT REWRITE SECTION 1 TO MAGICALLY REIMAGINE DOMINO'S DRIVERS AS WORKING OTHER THAN WITHIN THE "FLOW OF INTERSTATE COMMERCE." ................... 8

CONCLUSION .................................................................................................... 11

CERTIFICATE OF COMPLIANCE .................................................................. 12

CERTIFICATE OF SERVICE ............................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) .................................. 2, 6, 7

*Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186 (1974) ........................................10

*New Prime v. Oliveira*, 139 S. Ct. 532 (2019) ......................................................2, 8

*Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022) .....................................2, 9

*The Daniel Ball*, 77 U.S. 557, 565 (1870) ...............................................................10

*United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271 (1975) ..............................10

**Statutes**

Federal Arbitration Act, 9 U.S.C. 1 *et seq*. ..................................................... 1, 3, 6

**Other Authorities**

67 Cong. Rec. 732 (1922) ............................................................................................3

Christopher R. Leslie, *The Arbitration Bootstrap*, 94 Tex. L. Rev. 265 (2015) .......5

Julius Henry Cohen & Kenneth Dayton, *The New Federal Arbitration Law*, 12 Va. L. Rev. 265 (1926) ....................................................................................................4

Committee on Commerce, Trade & Commercial Law, *The United States Arbitration Law and Its Application*, 11 A.B.A.J. 153 (1925) ...................................................4

John J. George, *Motor Carrier Regulation in the United States* (1929) ...................7

*Hearing on S. 4213 and S. 4214 Before the S. Subcomm. of the Judiciary*, 67th Cong. 9 (1923) .................................................................................................................5, 6

Robert D. Leiter, *The Teamsters Union: A Study of Its Economic Impact* (1957) ....7

Margaret L. Moses, *Statutory Misconstruction: How the Supreme Court Created a Federal Law Never Enacted by Congress*, 34 Fla. St. U. L. Rev. 99 (2006) .........5

*Organization and Membership of American Trade Unions*, 23(2) Monthly Lab. Rev. 13 (Aug. 1926) ..........................................................................................................7

*Seamen Condemn Arbitration Bill*, N.Y. Times, Jan. 14, 1923 .................................. 4

*Strike Paralyzes Railway Express*, N.Y. Times, Oct. 14, 1919 ................................ 7

Imre Szalai, *Outsourcing Justice: The Rise of Modern Arbitration Laws in America* (2013) ............................................................................................................. 4, 6

## IDENTITY AND INTEREST OF AMICUS CURIAE

The American Association for Justice ("AAJ") is a national, voluntary bar association established in 1946 to strengthen the civil justice system, preserve the right to trial by jury, and protect access to the courts for those who have been wrongfully injured. With members in the United States, Canada, and abroad, AAJ is the world's largest plaintiff trial bar. AAJ's members primarily represent plaintiffs in personal injury actions, employment rights cases, consumer cases, and other civil actions. For more than 75 years, AAJ has served as a leading advocate of the right of all Americans to seek legal recourse for wrongful injury.[1]

AAJ is concerned that the overly broad construction of the Federal Arbitration Act advanced by Appellant in this case undermines the right of American workers to pursue their statutory and common-law rights in a judicial forum.

## SUMMARY OF ARGUMENT

The bill which became the Federal Arbitration Act ("FAA"), 9 U.S.C. 1 *et seq.* ("FAA"), was written by a committee of the American Bar Association ("ABA") to make arbitration agreements between merchants enforceable when entered into during the course of international and interstate commerce. Scholarship over the past

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part. No person, other than amicus curiae, its members, and its counsel, contributed money that was intended to fund the preparation or submission of this brief.

twenty years has come to a consensus that workers, including the transportation workers before this Court, were never intended to be subject to its arbitration provisions.

The first U.S. Supreme Court case to address the scope of the FAA exemption language was *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001). The Court concluded that all transportation workers working within the stream of commerce were exempted from the FAA. The Court held that just as merchant arbitration contracts, indisputably covered by the FAA, cover all goods in the stream of commerce from their initiation to final delivery, all transportation workers involved in this stream were similarly covered by this legislatively enacted exemption.

Since *Circuit City* was decided, there have been repeated attempts to chip away at the broad holding that all transportation workers acting within the stream of commerce were exempted from the FAA. When considered by the Supreme Court, each has been unanimously rejected. First, the Court batted away an attempt to drastically reduce the number of exempt transportation workers, rejecting the argument that only actual employees in the current sense and not independent contractors were exempted. *New Prime v. Oliveira*, 139 S. Ct. 532, 539 (2019). Then, the Court rejected an attempt to limit the exemption for transportation workers to only those workers who physically transported goods across state lines. *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022).

While the Supreme Court did remand this case for review, after two unanimous decisions completely rejecting attempts to tightly define the definition of transportation workers, there is little to suggest that the Supreme Court wishes this Court to do what it has twice unanimously refused to do.

## ARGUMENT

**I. THE EXEMPTION LANGUAGE OF THE FEDERAL ARBITRATION ACT WAS MEANT TO EXCLUDE ALL EMPLOYEE CONTRACTS, INCLUDING THE CONTRACTS OF DOMINO'S "BIG-RIG" PLAINTIFFS HEREIN, FROM THE FAA.**

Substantial recent scholarship over the past twenty years has come to the consensus that Section 1 of the FAA, exempting "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," was designed to apply to all workers.

**A. Background of the FAA.**

The Congressional bill that would become the FAA was drafted by Julius Henry Cohen, who served as general counsel for the New York State Chamber of Commerce and who had spearheaded that state's successful commercial arbitration statute, for the American Bar Association's Committee on Commerce, Trade and Commercial Law. The draft federal statute, entitled the United States Arbitration Act, was adopted by the ABA in 1922 and was introduced in the House and Senate on December 20, 1922. *See* 67 Cong. Rec. 732, 797 (1922).

Julius Cohen broadly summarized the purpose of the ABA's proposed bill:

3

> A written provision for arbitration contained in any contract which involves maritime transactions (matters which would be embraced within admiralty jurisdiction), or interstate commerce as generally defined, is made "valid, enforceable and irrevocable," except upon the grounds for which any contract may be revoked.

Julius H. Cohen & Kenneth Dayton, *The New Federal Arbitration Law*, 12 Va. L. Rev. 265, 267 (1926); *see also* Committee on Commerce, Trade & Commercial Law, *The United States Arbitration Law and Its Application*, 11 A.B.A.J. 153, 153 (1925). Notably, this original bill did not include an exemption for "contracts of employment."

**B. Congressional Hearings Addressed Labor Opposition to Arbitration of Employment Contracts by Using the ABA's Revised Language, Adding an Exemption to Section 1.**

The bill sparked strong opposition from the International Seamen's Union of America and the American Federation of Labor. Both unions were staunch opponents of giving arbitrators authority over individual employment contracts. *See Seamen Condemn Arbitration Bill*, N.Y. Times, Jan. 14, 1923, at 21; Imre Szalai, *Outsourcing Justice: The Rise of Modern Arbitration Laws in America* 132 (2013);

A subcommittee of the Senate Judiciary Committee held hearings in January 1923 that make clear that the sole focus of the Act was merchant-to-merchant arbitrations. *See* Margaret L. Moses, *Statutory Misconstruction: How the Supreme Court Created a Federal Law Never Enacted by Congress*, 34 Fla. St. U. L. Rev. 99,

4

106 (2006); Christopher R. Leslie, *The Arbitration Bootstrap*, 94 Tex. L. Rev. 265, 306-07 (2015).

When asked about the objections posed to the bill by the heads of the Seamen's Union and the AFL, the chairman of the ABA Committee of Commerce Trade and Commercial Law, which wrote the bill, pointedly testified:

> He has objected to it, and criticized it on the ground that the bill in its present form would affect, in fact compel, arbitration of the matters of agreement between stevedores and their employers. Now, it was not the intention of the bill to have any such effect as that. It was not the intention of this bill to make an industrial arbitration in any sense; and so I suggest … they should add to the bill the following language, "but nothing herein contained shall apply to seamen or any class of workers in interstate and foreign commerce." **It is not intended that this shall be an act referring to labor disputes, at all.** It is purely an act to give the merchants the right or the privilege of sitting down and agreeing with each other as to what their damages are, if they want to do it. Now, that is all there is in this.

*Hearing on S. 4213 and S. 4214 Before the S. Subcomm. of the Judiciary*, 67th Cong. 9 (1923) [hereinafter 1923 Hearings] (emphasis added).

The Committee also heard from Secretary of Commerce Herbert Hoover, who had long advocated for the passing of the FAA, pointing to the New York Arbitration Act's ability to relieve congestion in the New York court system. But Hoover was also lobbied by railroad worker unions to have railroad employees expressly excluded from the mandates of the bill.

Therefore, Hoover wrote the Committee, noting the objections to the "inclusion of workers' contracts, and proposing that language be added stating "but

nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in interstate or foreign commerce." 1923 Hearings, *supra*, at 14 (letter of H. Hoover, Secretary of Commerce.)

When the bill was reintroduced in the next session of Congress, it contained Secretary Hoover's exemption language. This inclusion was lauded by the Seamen's Union, AFL, and railroad unions, all of whom felt that the exemption language completely dealt with their objections. Szalai, *supra*, at 134-35. The bill sailed through Congress without opposition, and on February 12, 1925, President Coolidge signed it into law.

II. **IN *CIRCUIT CITY* AND *NEW PRIME*, THE SUPREME COURT CONSTRUED THE EXEMPTION TO APPLY TO ALL TRANSPORTATION WORKERS ACTING WITHIN THE STREAM OF COMMERCE**

The first Supreme Court case to address the exemption language of Section 1 was *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001). Without the benefit of the fulsome history, which has resulted from scholarly research over the past twenty years, the Court applied a "textual" analysis, using the canon of construction *ejusdem generis*. Relying on this canon, the Court concluded that "any other class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, "should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it." 532 U.S. at 115. The Court, therefore, concluded that because "seamen" (included in the ABA's first draft of the exemption) and "railroad

6

employees" (added by Hoover) both work in transportation, "other workers" meant all other "transportation workers." *Id.* at 109-11. At the same time, the Court held that in passing the FAA, Congress fully intended "to exercise [its] commerce power to the full." *Id.* at 112 (citation omitted).

Notably, a century ago, "other transportation workers" constituted a significant segment of the workforce in addition to seamen and railroad workers; in 1926, 25,000 trucks and over 3,000 buses engaged in motor commerce. *See* John J. George, *Motor Carrier Regulation in the United States* 215 (1929). Furthermore, the largest AFL-affiliated transportation-based membership union, the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America ("Teamsters"), had 100,000 members. *Organization and Membership of American Trade Unions*, 23(2) Monthly Lab. Rev. 13 (Aug. 1926).

Lobbying by the AFL between 1923 and 1925 would have been done on behalf of all members of its affiliated unions and certainly on behalf of its largest member union, the Teamsters Union. Teamsters' President Daniel Tobin was a member of the AFL's executive counsel. Robert D. Leiter, *The Teamsters Union: A Study of Its Economic Impact* 38 (1957). Teamster refusal to cross picket lines was often critical to the success of labor actions. *See, e.g.*, *Strike Paralyzes Railway Express*, N.Y. Times, Oct. 14, 1919, at 1. Given this, it strains credulity to think that Gompers and the AFL, in lobbying on behalf of the Teamsters among others, would

7

have accepted cutting out a large portion of the Teamsters' membership, who largely operated intrastate, from the benefits of the exemption, much less lauding the result. Yet to accept Appellants' cramped interpretation that Congress did not mean the exemption to apply to the majority of Teamsters members would require that wildly unlikely belief.

Moreover, the breadth of *Circuit City's* worker coverage was subsequently reaffirmed in *New Prime v. Oliveira*, 139 S. Ct. 532 (2019). Reacting to Petitioner New Prime's attempt to graft a twenty-first century meaning onto the 1925 statute, Justice Gorsuch, writing for a unanimous court, refused New Prime's request to limit the scope of covered transportation workers by rejecting their definition of "contract of employment": "[T]his modern intuition isn't easily squared with evidence of the term's meaning at the time of the Act's adoption in 1925. At that time, [it] usually meant nothing more than an agreement to perform work."[2] *Id.* at 539.

### III. *SAXON* DOES NOT REWRITE SECTION 1 TO MAGICALLY REIMAGINE DOMINO'S DRIVERS AS WORKING OTHER THAN WITHIN THE "FLOW OF INTERSTATE COMMERCE."

Appellants' argument appears to be that the Domino's drivers in question are not exempt from the FAA, because their individual routes are intrastate. For support,

---

[2] *New Prime* also rejected the suggestion that the exception's text should be viewed through the lens of a "liberal federal policy favoring arbitration agreements." *Id.* at 543 (citation omitted).

Appellants take out of context a brief statement by Justice Thomas, writing for a unanimous court in *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022), in which he rejected an industry-wide approach to the statutory exemption. Ignored by Appellants are Justice Thomas's examples of occupations to which he believes the exemption would not apply: "shift schedulers," "those who design Southwest's website," and "those who run the Southwest credit-card points program." *Id.* at 1791-91. And, indeed, there is little argument that these workers are "transportation workers." *See id.*

However, just as clearly, the *Saxon* Court defines transportation workers under the statute to include those who "load and unload cargo" despite the fact that they never travel physically in their jobs, much less travel interstate. *Id.* at 1789. Such loaders, just as Teamster "helpers," are a necessary component of the interstate transfer of goods between origination and the ultimate consumer.

Applied to Domino's, there is no logical construct that would have such an exemption applied to those who unload and load Domino's cargo that comes in from out of state, as clearly decided by *Saxon*, but not apply to truck drivers who actually physically transport Domino's goods. Yet, Appellant's strained argument requires supporting the illogical construct that immobile loaders are exempt while "big-rig" drivers are not. Of course, this is not the case.

9

The Supreme Court has consistently held that the exemption extends to all those who perform "activities within the flow of interstate commerce" *Id.* at 1792. Indeed, long before the FAA became law, the Court had held that purely intrastate trips were in the flow of commerce when they were a component part of interstate movement. *The Daniel Ball*, 77 U.S. 557, 565 (1870) ("[F]or whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced."). There is little question that Domino's deliveries to its regional hubs would be meaningless if the component ingredients never made it to franchises in order to be served to consumers.

Ultimately, Domino's has created a scheme designed to transport their goods to the ultimate consumer. In *United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271 (1975), the Supreme Court broadly defined "the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." 422 U.S. at 276 (quoting *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974)).

Finally, it must be remembered that the FAA itself was meant to govern arbitration agreements between merchants covering all matters related, for instance, to seafaring vehicles and within the flow of commerce from a product's manufacture to final delivery. As Julius Cohen stated, "There can be no question that the

10

transportation of goods sold or contracted to be sold as described in the first section of the bill is interstate or foreign commerce." 1923 Hearings, *supra*, at 17.

## CONCLUSION

This Court should affirm the prior holding of the U.S. Court of Appeals for the Ninth Circuit.

Respectfully submitted,

/s/ Gerson H. Smoger
GERSON H. SMOGER
SMOGER & ASSOCIATES
4228 Hallmark Drive
Dallas, TX 75229
(972) 243-5297
gerson@texasinjurylaw.com

*Counsel for Amicus Curiae*

Dated: February 1, 2023

11

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 29-2 because this brief contains 2,464 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman type style.

Date: February 1, 2023

/s/ Gerson H. Smoger
GERSON H. SMOGER

## CERTIFICATE OF SERVICE

I, Gerson H. Smoger, counsel for amicus curiae and a member of the Bar of this Court, hereby certify that on February 1, 2023, electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I also certify that the foregoing document is being served on this day on all counsel of record via transmission of the Notice of Electronic Filing generated by CM/ECF. All participants in this case are registered CM/ECF users:

Aashish Yadvendra Desai
Desai Law Firm, P.C.
3200 Bristol Street, Suite 650
Costa Mesa, CA 92626

Norman M. Leon
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606

Courtney G. Saleski
DLA Piper LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA 19103

Jacob Frasch
DLA Piper LLP (US)
500 8th Street NW
Washington, DC 20004

/s/ Gerson H. Smoger
GERSON H. SMOGER