No. 21-55009

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**EDMOND CARMONA, ABRAHAM MENDOZA, ROGER NOGUEIRA,** on behalf of themselves and all others similarly situated,

*Plaintiffs - Appellees*,

v.

**DOMINO'S PIZZA LLC,**

*Defendant - Appellant*.

Appeal from the United States District Court for the Central District of California
Case No. 8:20-cv-01905-JVS-JDE—The Honorable James V. Selna

# SUPPLEMENTAL REPLY BRIEF OF DEFENDANT-APPELLANT DOMINO'S PIZZA LLC

| Norman M. Leon | Courtney G. Saleski | Jacob Frasch |
|---|---|---|
| **DLA PIPER LLP (US)** | **DLA PIPER LLP (US)** | **DLA PIPER LLP (US)** |
| 444 West Lake Street, Suite 900 | 1650 Market Street Suite 5000 | 500 8th Street NW Washington, DC 20004 |
| Chicago, IL 60606 | Philadelphia, PA 19103 | (202) 799-4491 |
| (312) 368-4000 | (215) 656-2431 | |

*Attorneys for Defendant-Appellant Domino's Pizza LLC*

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................1

Analysis...............................................................................................................1

    I.    SAXON FORECLOSED RELIANCE ON WHAT DOMINO'S "DOES GENERALLY" ..............................................................................1

    II.    PLAINTIFFS ARE NOT "DIRECTLY INVOLVED" OR "ACTIVELY ENGAGED" IN TRANSPORTING GOODS "ACROSS BORDERS" .....2

    III.    SAXON DID NOT CREATE A STREAM-OF-COMMERCE TEST .......4

    IV.    THE "STREAM OF COMMERCE" ENDED AT THE SUPPLY CENTER ..................................................................................................5

Conclusion ........................................................................................................11

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Archer v. Grubhub, Inc.*,
   490 Mass. 352 (2022) ..................................................................................3, 4

*Carmona v. Domino's Pizza, LLC*,
   21 F.4th 627 (2021) ..........................................................................................2

*Circuit City Stores, Inc. v. Adams*,
   532 U.S. 105 (2001) .........................................................................................4

*Erie R. Co. v. Shuart*,
   250 U.S. 465 (1919) .....................................................................................3, 5

*Immediato v. Postmates, Inc.*,
   54 F.4th 67 (1st Cir. 2002) ..........................................................................3, 4

*Klitzke v. Steiner Corp.*,
   110 F.3d 1465 (9th Cir. 1997) .......................................................................10

*Lopez v. Cintas Corp.*,
   47 F.4th 428 (5th Cir. 2022) ............................................................................4

*McLeod v. Threlkeld*,
   319 U.S. 491 (1943) .........................................................................................6

*Rittmann v. Amazon.com, Inc.*,
   971 F.3d 904 (9th Cir 2020) ....................................................................10, 11

*S. Pac. Transp. Co. v. I.C.C.*,
   565 F.2d 615 (9th Cir. 1977) .........................................................................10

*Wallace v. Grubhub Holdings, Inc.*,
   970 F.3d 798 (7th Cir. 2020) ...........................................................................8

*Walling v. Jacksonville Paper Co.*,
   317 U.S. 564 (1943) ................................................................................passim

*Zosla v. MCA Distribution Corp.*,
   693 F.2d 870 (9th Cir. 1982) .........................................................................10

**Statutes**

Fair Labor Standards Act ...................................................................................6, 7

Federal Arbitration Act ........................................................................................2

**Other Authorities**

Fed. R. App. P. 32(a)(5)......................................................................................13

Fed. R. App. P. 32(a)(6)......................................................................................13

Fed. R. App. P. 32(f)...........................................................................................13

Nov. 15, 2021 Oral Argument at 9:19-9:37 (available at
    https://www.ca9.uscourts.gov/media/video/?20211115/21-55009/)....................9

**INTRODUCTION**

In *Southwest Airlines Co. v. Saxon*, the Supreme Court unmistakably "rejected [an] industrywide approach" to the residual clause and instead instructed courts to consider "what [a plaintiff] does at [his employer's business, and] not what [his employer] does generally." 142 S. Ct. 1783, 1788 (2022). Although Plaintiffs suggest that *Saxon* did not mean what it said, the Supreme Court's guidance could not be clearer: the relevant question in a residual-clause analysis is whether the worker is "directly involved" or "actively engaged" in "transporting goods across state or international borders[.]" *Id.* at 1789, 1790.

These Plaintiffs were not. They never crossed state lines and played no role in moving goods across those lines. Lowering the *Saxon* standard and instead simply asking whether the goods were still in the "stream of commerce" when Plaintiffs handled them does not help Plaintiffs, because those goods were purchased and stored at the Supply Center *prior to* and *independently of* any order from any specific franchisee. So, under the holdings of the Supreme Court and this Court, those goods exited the stream of commerce before Plaintiffs ever touched them.

**ANALYSIS**

**I.   *SAXON* FORECLOSED RELIANCE ON WHAT DOMINO'S "DOES GENERALLY"**

The Prior Opinion held that the "'critical factor' in determining whether the residual clause exemption applies" is "the nature of the business for which a class of

1

workers performed their activities." *Carmona v. Domino's Pizza, LLC*, 21 F.4th 627, 629 (2021). Because it concluded that "Domino's is directly involved in the procurement and delivery of interstate goods," the Prior Opinion held that Plaintiffs were beyond the reach of the Federal Arbitration Act. *Id*. at 630.

Inviting this Court to adopt that conclusion anew, Plaintiffs assert that the residual-clause analysis "cannot be divorced from the employer's business" and that Domino's "is simply wrong" in arguing that *Saxon* "rejected an 'industrywide approach' to the residual clause exemption." Suppl. Opp'n Br. at 3–4. *Saxon* clearly states otherwise:

> Saxon argues that because air transportation as an industry is engaged in interstate commerce, airline employees constitute a class of workers covered by [the residual-clause exemption]. The Court of Appeals *rejected* Saxon's *industrywide approach*, and so do we.

*Saxon*, 142 S. Ct. at 1788 (emphasis added).

Under *Saxon*, the proper focus is "on what [Plaintiffs] do[] at [Domino's], not what [Domino's] does generally." *Id*. Plaintiffs' continued assertion to the contrary is irreconcilable with *Saxon* and should be rejected.

## II. PLAINTIFFS ARE NOT "DIRECTLY INVOLVED" OR "ACTIVELY ENGAGED" IN TRANSPORTING GOODS "ACROSS BORDERS"

*Saxon* is similarly clear regarding which workers fall within the scope of the residual-clause exemption:

> [A]ny class of workers *directly involved* in transporting goods *across state or international borders* falls within [the] exemption.

2

> [T]ransportation workers must be *actively engaged* in transportation of those goods *across borders*[.]

*Id*. at 1789, 1790. Plaintiffs do not satisfy this standard.

In *Saxon*, the luggage handled by the plaintiff could not have completed its cross-border journey without being loaded onto, and unloaded from, the airplanes: "'[T]here could be no doubt that [interstate] transportation [is] still in progress,' and that a worker is engaged in that transportation, when she is 'doing the work of unloading' or loading cargo from a vehicle carrying goods in interstate transit." *Id.* (quoting *Erie R. Co. v. Shuart*, 250 U.S. 465, 468 (1919)).

Plaintiffs do not load or unload trucks delivering goods to the Supply Center. They become involved with those goods only *after* that interstate journey ends—*i.e.*, the goods' interstate journey occurs whether Plaintiffs show up to work or not. Indeed, "[it] is by *happenstance*, and *not* as a result of any contribution of [Plaintiffs'] to the interstate journey, that the goods . . . have crossed a state border at some point in time." *Immediato v. Postmates, Inc.,* 54 F.4th 67, 79 (1st Cir. 2022).

Post-*Saxon* decisions involving last-mile drivers have reached this same conclusion, notwithstanding Plaintiffs' mischaracterization of those cases. Plaintiffs suggest that the drivers in both *Immediato* and *Archer v. Grubhub, Inc.*, 490 Mass. 352 (2022), delivered only "meals." Suppl. Opp'n Br. at 7. Not true. The *Immediato* drivers also delivered "comestibles and sundries from local grocery stores," 54 F.4th at 72, and the *Archer* drivers also delivered "prepackaged items, such as a bottle of

3

soda or a bag of potato chips," 490 Mass. at 353. Likewise, Plaintiffs suggest that *Lopez v. Cintas Corp.*, 47 F.4th 428, 433 (5th Cir. 2022), turned on the fact that those drivers were tasked with "sales and customer service" duties. Suppl. Opp'n Br. at 8. But *Lopez* states otherwise: "[A]nyone interacting with th[e] goods" after they "arrived" and "were unloaded" at the warehouse "was no longer engaged in interstate commerce." 47 F.4th at 433.

### III. *SAXON* DID NOT CREATE A STREAM-OF-COMMERCE TEST

Plaintiffs and the *amici* wrongly assume that *Saxon* grafted a stream-of-commerce test onto the residual-clause analysis.[1] It did not. Instead, to retain the residual clause's "narrow construction," *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001), *Saxon* held that only workers "*directly* involved" or "*actively* engaged" in transporting goods across borders qualify for that exemption.

In creating this test, the Court carefully defined the role—"direct" or "active"—that a worker must play in transporting goods across borders. The Court

---

[1] One of the *amici* relies on legislative history to contend that the residual-clause exemption "was meant to exclude *all* employee contracts." Br. of the American Ass'n for Justice at 3–6 (emphasis added). That argument—and reliance on that *precise* legislative history—was rejected by *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119–20 (2001).

Plaintiffs and that *amicus* also repeatedly refer to Plaintiffs' vehicles as "big-rig" trucks. *See, e.g.,* Suppl. Opp'n Br. at 1. Of course, *Saxon* does not suggest any correlation between the size of a worker's vehicle and whether he is encompassed by the residual-clause exemption.

repeatedly referenced the *actual, cross-border transportation* of goods. And, perhaps *most tellingly*, the Court did *not* rely on stream-of-commerce precedent in concluding that the *Saxon* plaintiff was "intimately involved" with the "transportation" of the luggage, 142 S. Ct. at 1790; instead, it relied on a case deciding whether livestock was still "being transported," as that term was used in a bill of lading—*i.e.*, a run-of-the-mill contract-interpretation case. *See Erie R. Co.*, 250 U.S. at 466–67. Reading *Saxon* as imposing a stream-of-commerce test ignores the plain terms of the Court's analysis and broadens the narrow test it chose to adopt.

## IV. THE "STREAM OF COMMERCE" ENDED AT THE SUPPLY CENTER

Even if *Saxon* adopted a stream-of-commerce test (it did not), Plaintiffs would still not fall within the scope of the residual clause because the undisputed facts establish that the goods they delivered arrived and remained at the *in*-state Supply Center *unless and until* they were ordered by the *in*-state franchisees. Therefore, as the Supreme Court and this Court have repeatedly made clear, those goods *exited* the stream of commerce before Plaintiffs ever touched them.

As previously noted, the Supreme Court distinguishes between goods delivered "to customers whose *prior orders* or contracts are being filled," *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 569 (1943) (emphasis added), and goods held "*for general local disposition*," *McLeod v. Threlkeld*, 319 U.S. 491, 494 (1943)

5

(emphasis added). The former goods, the Supreme Court has made clear, are *in* the stream of commerce, while the latter are not. Suppl. Br. at 10–11.

The goods Plaintiffs delivered admittedly fall into the latter category, so Plaintiffs never attempt to deal with this line of precedent. *Amici* attempt to grapple with it, but their assertion that the Supreme Court "has never drawn such a line," Br. of the Constitutional Accountability Center at 6, is simply wrong.

In *Walling*, a wholesaler imported out-of-state paper products for sale to in-state customers. 317 U.S. at 569. The Court held that products obtained to fill "*prior* orders or contracts" remained in the stream of commerce until final delivery to the customer, even if those products were temporarily held at the wholesaler's warehouse. *Id.* (emphasis added).

By contrast, the Court held that products obtained and held at the warehouse for *subsequent* order and delivery to *in*-state customers were *no longer* in the stream of commerce—and that the employees making those deliveries were not "engaged in [interstate] commerce" for purposes of the Fair Labor Standards Act. *Id.* at 569–70. The Court reached this conclusion *despite* acknowledging that: the wholesaler's manager "ha[d] a fair idea of when and to whom the merchandise w[ould] be sold" "before placing his orders"; the manager was "able to estimate with considerable precision the immediate needs of his customers even where they d[id] not have contracts calling for future deliveries"; "most of the customers form[ed] a fairly

6

stable group"; and the "orders [we]re recurrent as to the kind and amount of merchandise[.]" *Id.* For the Court, this evidence was simply insufficient to demonstrate "that the goods in question were different from goods acquired and held by a local merchant for local disposition." *Id.* at 570.

The same can largely be said about the Supply Center, including that "most of its customers form a fairly stable group" and that Domino's "has of a fair idea" of "to whom the merchandise will be sold." It is undisputed that *none* of the goods at the Supply Center are obtained to fill "prior orders or contracts." And it does not matter if (as Plaintiffs assert without citation) the Supply Center "measure[s], analyze[s,] and know[s] exactly what its franchise stores need" or "order[s] exactly the type, quantity[,] and quality of cheese, olives[,] and onions" the franchisees use. Suppl. Opp'n Br. at 6 n.2. Under *Walling*, even "estimat[ing] with considerable precision the immediate needs of" customers is insufficient to keep goods in the stream of commerce. 317 U.S. at 566.

It also does not matter that Domino's *hopes* that the goods delivered to the Supply Center will *eventually* get purchased by the franchisees. If the stream-of-commerce analysis turned on aspirations, then *no* goods would *ever* leave the stream before reaching a consumer or final user. Every local retailer hopes to sell every item it stocks. But that does not mean the teenager delivering groceries grown in another state, or the child delivering newspapers on paper milled in another state, is "engaged

7

in interstate commerce" under the FAA. *Cf. Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 802 (7th Cir. 2020) ("[P]laintiffs' interpretation would sweep in numerous categories of workers whose occupations have nothing to do with interstate transport—for example, dry cleaners who deliver pressed shirts manufactured in Taiwan and ice cream truck drivers selling treats made with milk from an out-of-state dairy.").

Plaintiffs have no sound rejoinder to these cases or these facts. So they claim, instead, that "the relationship between when and how Domino's franchise stores order product . . . has not been tested" and that franchisees are "required" to purchase their supplies from the Supply Center. Suppl. Opp'n Br. at 5–6, n.2. The former assertion comes far too late; the latter assertion is unsupported, false, and belied by Plaintiffs' own submission.

To begin with, it was Plaintiffs' burden to demonstrate that they fell within the scope of the residual-clause exemption and thus Plaintiffs' responsibility to gather any evidence available to make that showing. Plaintiffs chose not to do that. After years of litigation, including a trip to the Supreme Court, it is too late to now seek "test[ing]" of Domino's relationship with its franchisees—*especially* since Plaintiffs simultaneously assert that the details of that relationship are irrelevant. *Id.* at 6 ("[Domino's] franchisees order the goods from its supply center only after Domino's has already purchased them. *So what?*" (emphasis added)).

In any event, the evidence Plaintiffs belatedly attempt to add to the record *supports* Domino's previous representation to this Court: Franchisees *are not* required to purchase goods from Dominos, but instead "*voluntarily* choose" to do so.[2] *See* Domino's Pizza, Inc., Annual Report (Form 10–K) (Mar. 1, 2022) at 7; *see also* Nov. 15, 2021 Oral Argument at 9:19-9:37 (available at https://www.ca9.uscourts.gov/media/video/?20211115/21-55009/).

*Walling*'s principles compel the conclusion that Plaintiffs are outside the stream of commerce. And *Walling* is no archaic constitutional outlier. This Court has repeatedly—and *recently*—relied on *Walling*'s reasoning. In *Watkins v. Ameripride Services*, for example, an employer imported out-of-state uniforms and stored them. 375 F.3d 821 (9th Cir. 2004). Plaintiff later delivered those same uniforms to fill *subsequent*, *in*-state orders placed by *in*-state customers. Because the uniforms "were fungible, and were taken from general inventory *after* the customer made an order[,]" this Court held they "were *not* delivered in interstate commerce[] under the reasoning of" *Walling*. *Id.*

By contrast, in *Klitzke v. Steiner Corp.*, 110 F.3d 1465 (9th Cir. 1997), an employer imported out-of-state linens *after* receiving customer orders. Because the orders were placed "to satisfy [preexisting] contracts," which contracts "specified a

---

[2] It is irrelevant if Domino's makes this choice an easier or more economically attractive one; there is no good-bargain extension to the stream of commerce.

9

final place of delivery . . . *other than the [employer's] warehouse*," this Court held that the linens were "in continuous transportation until delivered to [the] customers." *Id.*; *see also Zosla v. MCA Distribution Corp.*, 693 F.2d 870, 878 (9th Cir. 1982) ("[G]oods leave the stream of commerce when they are stored in a warehouse or storage facility for general inventory purposes, that is, with *no particular customer's needs in mind*." (emphasis added)); *cf. S. Pac. Transp. Co. v. I.C.C.*, 565 F.2d 615, 618 (9th Cir. 1977) (employees delivering goods to an *in*-state warehouse were not engaged in interstate commerce; though most of the goods were eventually shipped across state lines, the employer "*did not decide the final destination* of any shipment of goods *until after* the goods had come to rest in the . . . warehouse" (emphasis added)).

*Walling*'s reasoning, in fact, formed the basis of this Court's decision in *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020), even if that decision did not cite *Walling*. There, this Court noted that "new or subsequent [in-state] transactions . . . *mark[] the dividing line* between interstate and intrastate commerce." *Id.* at 916. And because packages delivered by the Amazon drivers were "*not* held at warehouses for later sales to local retailers" but were instead "simply . . . transfer[red] . . . to a different vehicle for the last mile," this Court determined that the drivers were "engaged in the movement of interstate commerce." *Id.*

10

In sum, assuming the stream of commerce approach continues to be good law, Domino's *does not*, as Plaintiffs contend, "continue[] to disagree with *Rittmann* as to its 'coming to rest' analysis for interstate commerce[.]" Suppl. Opp'n Br. at 7. Instead, Domino's point is that that analysis, if relevant, is satisfied here.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's December 9, 2020 Order denying Domino's Motion to Compel Arbitration, remand the case to the district court, and order the district court to grant the Motion.

| | |
|---|---|
| February 13, 2023 | **DOMINO'S PIZZA LLC** |
| | |
| | s/ Norman M. Leon |
| | Norman M. Leon |
| | **DLA Piper LLP (US)** |
| | 444 West Lake Street |
| | Suite 900 |
| | Chicago, Illinois 60606-0098 |
| | |
| | Courtney G. Saleski |
| | **DLA Piper LLP (US)** |
| | 1650 Market Street |
| | Suite 5000 |
| | Philadelphia, PA 19103 |
| | |
| | Jacob Frasch |
| | **DLA Piper LLP (US)** |
| | 500 8th Street NW |
| | Washington, DC 20004 |
| | |
| | *Attorneys for Defendant-Appellant Domino's Pizza LLC* |

## **CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of this Court's November 22, 2022 order because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 2,497 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using fourteen-point Times New Roman.

<u>/s Norman M. Leon</u>
Norman M. Leon

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing SUPPLEMENTAL REPLY BRIEF OF DEFENDANT-APPELLANT DOMINO'S PIZZA LLC was filed with the Clerk of the Court by using the CM/ECF system, which will automatically send a notice of this electronic filing to all counsel of record.

Dated: February 13, 2023

/s Norman M. Leon<br>
Norman M. Leon